## Case No. 6,955.

### HUTCHINSON v. COOMBS.

[1 Ware (65), 58.] [1]

District Court, D. Maine. Feb., 1825.

SEAMEN—DISCHARGE—WAGES.

1. The master may discharge a seaman from the vessel before the termination of the voy-

---

[1] [Reported by Hon. Ashur Ware, District Judge.]

age for a legal cause; but not for slight offences, nor for a single offence, unless of a very aggravated character.

[Cited in Nieto v. Clark, Case No. 10,262; The T. F. Oakes, 36 Fed. 445.]

2. If he has sufficient cause for discharging him, and the seaman repents, and offers amends and to return to duty, the master is bound to receive him.

3. The policy of the law discourages the discharge of seamen in foreign ports.

4. If a seaman is discharged without justifiable cause, and without his own consent, the measure of damages is the full amount of wages till the return of the vessel, and the expenses of his return.

[Cited in Worth v. The Lioness, No. 2, 3 Fed. 925; The Paul Revere, 10 Fed. 158.]
[Cited in Croucher v. Oakman, 3 Allen, 188.]

5. The intermediate earnings of the seaman may be deducted from the expenses of his return, but not from the wages due.

[Cited in Coffin v. Weld, Case No. 2,953; McCarty v. The City of New Bedford, 4 Fed. 827.]

6. The certificate of a consul that the seaman was discharged with his approbation, will not preclude the court from inquiring into the cause of the discharge, and awarding damages, if the discharge was unjustifiable.

[Cited in Jay v. Almy, Case No. 7,236; Campbell v. The Uncle Sam, Id. 2,372.]

7. If the master detains the clothing of the seaman, the value of it may be recovered in the same libel.

This was an action for a marine tort, brought by a seaman against the master for a wrongful discharge, before the termination of the voyage.

C. S. Daveis, for libellant.
Mr. Anderson, for respondent.

WARE, District Judge. This is a libel brought by Hutchinson, a mariner, to recover damages for a tortious discharge from the vessel, in a foreign port, before the completion of the voyage for which he shipped. The facts are, that he shipped as a seaman on board the bark Lloyd, of which the respondent was master, for a voyage from Portland to one or more ports in the West Indies, and back to her port of discharge in the United States, at fourteen dollars a month wages. The bark went to Havana, and remained there until she had completed the taking in of her cargo, before the occurrence of the event which led to the separation of the libellant from the vessel, and no suggestion has been made of any difficulty existing between Hutchinson and any of the officers, or of any complaint on the part of the officers against him, until this time. On the 7th of July, in the evening of the day before she sailed, Hutchinson was ordered by the mate to go down on the outside of the vessel and break up a raft, which had been used in the work about the vessel, and pass it on deck. The raft lay by the side of the bark, and was made fast to it by ropes. When he went down, the ropes were loosened and taken in, and it remained without any thing to confine it,

or prevent its drifting off with the tide. There was a gentle motion of the water, described by some of the witnesses as a soak, by others as a current, carrying the raft astern. When the ropes by which the raft was made fast were taken in, Hutchinson asked for the boat to be let down, to stand in, while he broke up and passed the raft on deck. The mate refused to permit this to be done. He then asked for a rope, to hold by and prevent the drifting of the raft, while he was breaking it up. This also was refused. The request for a boat or a rope was a number of times repeated, and as often refused, while Hutchinson was holding by the side of the vessel, to prevent the drifting of the raft. Once or twice he attempted to get on deck, but was prevented by the mate. He remained on the raft in this way, an hour, holding by the side of the vessel, and unable, as he said, to break up the raft without either a boat or a rope. He at last declared he could hold on no longer, and when he let go his hold the raft was carried off by the tide towards the Madeira packet, which was lying at anchor a short distance from the Lloyd. He got on board the packet, and remained there over night, and the next morning a Capt. Preston took him in a boat to put him again on board the Lloyd. On their way, they met Capt. Coombs in another boat. Preston spoke to him, and told him that he had a man whom he wished to put on board his vessel; Coombs replied that he might carry him back again, that he did not want him, that he would not take him in his boat, nor have him on board his vessel. Hutchinson then informed Capt. Coombs that he had secured his raft by the side of the Madeira packet, and returned with him to that vessel. This was in the morning. Capt. Preston also testifies that in the course of the day Hutchinson went on shore, as he stated, to find Capt. Coombs, and to get on board the Lloyd. He, however, either failed to find the captain, or failed in getting himself restored to the vessel. During the whole time that Hutchinson was on the raft by the side of the bark, Captain Coombs was on board, knew what was passing, and sanctioned the conduct of his mate. When Hutchinson left the bark, all his clothing, together with a quadrant belonging to him, remained on board and are still detained by the captain. He claims damage for the detention of these, as well as for his wrongful discharge.

These facts must be taken, I think, as fully making out the allegation in the libel of a discharge from the vessel without the mariner's consent. The question would then arise whether the circumstances of the case justified the master in dissolving the contract without the consent of the other party. But the master has pleaded a former judgment, and it is contended that this court is precluded from an inquiry into the merits, the same subject-matter having been formerly in controversy and adjudicated upon in another suit before a court of competent jurisdiction. From the copy of the record which is produced, it appears that Hutchinson was sued by Coombs and another, in an action of assumpsit, for the value of the raft, which it is alleged that he had taken and converted to his own use, on an implied promise to account for its value, stated at $12.50. There is also a charge of $4, for money paid a man in his absence, and $15 for detention of the vessel, occasioned by his desertion. Hutchinson defended, and filed an account in offset, charging the plaintiff for the whole amount of wages, which would have been due had he remained with the vessel till the completion of her voyage, amounting to $35, and giving him credit for $19.67, received of them, and $5.86, received as wages in the Madeira packet, during the time, leaving a balance of $9.47, due on the account. A copy of the account comes up among the papers, but no notice is taken of it in the record. Judgment was given by the justice, for the plaintiff, for the sum of $16.50, the exact amount of the two first charges in the account annexed to the plaintiff's writ.

It is contended by the counsel for the libellant that he is not precluded by this record from recovering damages in this libel, for his tortious discharge, if he has a just claim, because the claim is of such a nature as could not legally be allowed as an offset, and therefore the justice could not take it into consideration in making up his judgment, and because it does not appear from the record that it was adjudicated upon. If the account was legally before the justice, and was decided upon, the party, if aggrieved, should have sought his remedy by appeal. The merits of that judgment could not be reviewed in this way. But if the claim is one which by law cannot be admitted as an offset, but one the merits of which could be legally examined only in an original action on the demand, then it seems to me that the legal presumption will be that the justice gave the right judgment, and did not take the offset into consideration. If this be so, this court is not precluded from an examination of the merits of the claim.

The right of pleading or filing offsets is given and limited by statute. At common law, if the plaintiff was indebted to the defendant in as large or larger sum than the defendant owed him, there was no method of striking a balance, but the defendant was driven to his separate action, or obliged to resort to a court of equity. Tidd, Prac. 601. By the law of Maine, the defendant is allowed, when sued in certain actions, "to file any account which he hath" against the plaintiff, "and upon the general issue give the same in evidence against the plaintiff's demand." Laws Me. c. 59, § 19.

If his account exceeds that of the plaintiff, he shall have judgment for the balance. From the manner in which the word "account" is used in the statute, one would naturally infer that it was the intention of the legislature to restrict offsets to such claims as could properly be made the subject of a book charge, and this construction of the statute receives confirmation from the fact that a subsequent act was made to authorize the filing in offset of promissory notes. Id. c. 228. However this may be, the statute has never been construed so as to include a claim for unliquidated or uncertain damages. The English statute allowing of set-off, provides for setting off "mutual debts," adopting a word in common understanding of larger import than that used by the statute of Maine. Yet it has always been holden by the English courts that a claim for unliquidated damages cannot be the subject of a set-off. Howlet v. Strickland, Cowp. 56; Weigall v. Waters, 6 Term R. 488. The same point was decided in the supreme court of the United States, in the case of Winchester v. Hackley, 2 Cranch [6 U. S.] 342.

If this principle be correct, it becomes important to inquire what was the nature of the claim offered in this case as an offset. This I take to be conclusively settled by the case of Emerson v. Howland [Case No. 4,441]. The learned judge, in that case, after an ample discussion of the question upon principle and authority, decided that when a seaman is tortiously discharged before the completion of the voyage, he is entitled to a compensation for the injury according to the circumstances of his own particular case; that the amount of his damages is neither to be measured by the amount of wages which would be due, computed to the successful termination of the voyage, nor computed to the time of his own return to his country, but should be an indemnity for the actual injury he sustained by the breach of the contract. The claim, then, of Hutchinson, is most manifestly a claim for unliquidated damages, as uncertain as they can possibly be in any case, and therefore not the proper subject of an offset. As the court could not legally pronounce a judgment on the account, and as the record furnishes no evidence that it did, the legal and proper presumption is, that it gave the proper judgment, and did not consider the offset in the damages awarded.

This court is not then precluded by the record from an investigation of the merits of the case. Looking at the evidence, it cannot, as it appears to me, admit a doubt that this was a tortious discharge. The only fault or neglect charged on the mariner was his refusal to break up the raft under the circumstances before stated. As the case appears to me, there was quite as much fault in the officers as the man. He was required to break up the raft in the night time, the rope by which it was made fast to the vessel taken in, and a moderate current, according to all the witnesses, constantly carrying the raft from the vessel. It is evident that while he was passing up the boards, the raft would be constantly receding from the vessel, and would in a short time be at such a distance that it would not only be impracticable to pass the boards and plank on deck, but also impossible for him to regain the vessel. He did not refuse to do the work which was required of him; he merely asked for the boat to be let down, or a rope to be thrown to him, to enable him to do it. The refusal even of a rope, which might have been given without the least possible inconvenience, seems to have proceeded more from caprice than from any conceivable objection that could be made to so reasonable a request. The next day, Hutchinson offered to return, but the master refused to receive him. The only justification now offered for this refusal is his alleged misconduct the evening before. I have given my opinion of that transaction. But admitting all that is now pretended by the master, I am clear that it would not amount to a justification of his discharge.

That a master has, by the marine law, a right in certain cases to turn a mariner out of the vessel, is admitted. But this he cannot do for slight or venial offences, and certainly not for a single offence, unless of a very aggravated character. The cases stated in which a master is permitted to discharge a seaman are, when he is incorrigibly disobedient, and will not submit to do his duty (Thorne v. White [Case No. 13,989]); or if he is mutinous and rebellious, and persists in such conduct (Relf v. The Maria [Id. 11,692]); or guilty of gross dishonesty, as embezzlement or theft (Black v. The Louisiana [Id. 1,461]); or if he is an habitual drunkard, and a stirrer up of quarrels and broils, to the destruction of the discipline of the crew; or by his own fault renders himself incapable of performing his duty. The old sea laws mention some other cases which justify the master in discharging a mariner. But they enjoin temperance and forbearance on the part of the master, and require him to deny the man his mess three times, and permit him to remain in the vessel in the mean while, that is, for a day and a half, to allow him time to reflect and submit, before he proceeds to this extremity. If he repents and offers amends in that time, the master is bound to accept the satisfaction, and receive the man again into favor; if he refuses, the seaman will be entitled to his wages, and the master responsible to his owners for any loss or damage that may arise from this cause. These laws even go further, and say that a seaman shall not leave the vessel on the single order of the master, nor until he

has been three times denied his mess. Laws Oleron, arts. 6–13; Cleirac, 51, 52; Consulat. de la Mer. c. 267.

But without recurring to ancient marine ordinances, the principles of which have been generally adopted by all commercial nations, and which are referred to as constituting a sort of common law of the sea, the master must find insuperable difficulties in reconciling the discharge of a seaman in a foreign country, under these circumstances, with the spirit, or even letter of our own law. Every maritime nation has a deep interest in the protection and preservation of its seamen, as a class of men of indispensable necessity, for, the purposes both of peace and war. Their preservation, therefore, for the service of the country, becomes an object of public policy. The policy of the United States, in this respect, is very distinctly marked. As early as the year 1792, an act was passed, making it the duty of our consuls to provide for the support, at the public expense, of mariners employed in vessels belonging to citizens of the United States, who were suffering from shipwreck, sickness, or captivity, and also to provide the means of their returning to this country. 2 [Bior. & D.] Laws, p. 276, c. 125 [1 Stat. 256, c. 24]. The provisions of this act were superseded by the act of Feb. 28, 1803 [2 Stat. 203], which makes more ample provision for the same objects. By this act it is made the duty of the consuls to provide for such mariners of the United States as are found destitute within their districts, sufficient sustenance, and a passage to the United States at the public expense; and masters of vessels are required to receive them, and allow them a passage home, for a sum fixed by the law. By the same law it is provided, that whenever a vessel is sold in a foreign port, and the crew discharged, or a mariner is discharged with his own consent, the master shall, for every mariner so discharged, pay to the consul three months' wages beyond what is due for the time the men have served; two thirds of which are to be given to the seaman, to enable him to return to his country, and one third to be paid into the treasury, to constitute a fund for the payment of the passages of seamen who may be desirous of returning to the United States, and for the maintenance of destitute seamen in foreign ports. These enactments sufficiently show the solicitude of the government for the preservation of our seamen. But there is another section of the law more peculiarly applicable to the present case. This requires the master of a vessel bound on a foreign voyage, before he clears out his vessel, to deliver to the collector a list of his crew, certified by his oath, and the collector is required to give him a certified copy of this list. The master is also required to give a bond in the penal sum of $400, that he will produce to the first boarding officer, on his return to the United States, this copy with all the persons whose names are upon it, and report them to the collector. If he arrives at a different port from that from which he sailed, the collector shall transmit the copy to the collector of the port out of which he sailed. He is excused from producing any of the persons whose names are on the list, only by proof that they are dead, have absconded, or been impressed into other service, or that they have been discharged in a foreign port with the consent of the consul, which must be proved by his official certificate, under seal. The master appears not to have been ignorant of this law; for there is attached to the shipping articles which are produced in evidence, a certificate of our commercial agent at Havana, stating that Capt. Coombs has produced evidence, satisfactory to him, of the desertion of one of his crew, and that he had, with his consent, discharged another. I do not mean to say that this law will render a master liable in all cases to the seamen, in an action for damages, for a discharge without complying with its terms, however it might be in a suit for the penalty. The seaman, to entitle himself to damages, must make out his own case on its own merits; and his conduct may be such as to justify the master in a suit for the private injury, when it would not be a defence in a suit for the penalty. But the provisions of the act most strongly mark the parental solicitude of the government for the preservation and protection of the seamen of the country; and I think myself fully warranted in inferring from them, as the sense of the legislature, that a master ought not to discharge a seaman hastily, or for light or trivial causes. Finding the policy of our own laws in perfect accordance with the spirit and principles of the marine law on this subject. I cannot hesitate to pronounce the discharge of Hutchinson, in this case, illegal, and without a justifiable excuse.

The next question is, as to the rule of damages; and this, as I have before observed, is settled by the case of Emerson v. Howland [Case No. 4,441]. They are to be measured by injury. The principle stated in Abb. Shipp. 485, is to allow full wages to the end of the voyage, deducting such sum as the mariner may in the mean time have earned in another vessel. It is remarked by the learned judge, in the case before cited, that this deduction is not supported by any authority referred to in the text; and he adds, "If it be not supported by some authoritative decisions, it will deserve consideration, whether it be not more consonant to sound policy and justice to disregard it. especially as the laws of the United States manifestly intend to discourage all discharges of our seamen in foreign countries." The actual injury in such case to the seaman, is the loss of his full wages to the prosperous termination of the voyage, added to the expense of his return. Estimating the damages in this way, if there be

no precedent for deducting the intermediate earnings of the seamen from the amount of wages, after the intimation of the court just recited, I do not feel authorized to make one of the present case. It appears more in harmony with the policy of our law, as well as the principles of justice, to make the deduction, not from the amount of wages, but from the expenses of return; and this is the rule of the French law, 1 Valin, Comm. 706. I am the more willing to adopt the principle in this case, as the discharge appears to me to have been not only wholly without justification, but to be attended with some circumstances of unnecessary hardship. Hutchinson was not permitted to take from the vessel his necessary clothing. It was detained under the pretext of a forfeiture by desertion, without a shadow of reason; or as an indemnity for the loss of the raft, though the master was informed where the raft was to be found; and he was obliged to seek his passage home with no other clothing than what he had about his person at the time of leaving the vessel.

The libellant also claims damage for the tortious taking and detention of his clothing and a quadrant by the master. These articles were immediately taken by the captain into his possession, and are still detained. If Hutchinson had deserted, they might have been detained as a forfeiture, or if he had committed any offence which justified his expulsion from the vessel, the same right might perhaps have resulted to the master. But both these grounds of justification fail. I can see no legal right which the master had to withhold them; and his preventing Hutchinson from coming on board the vessel and taking them, and his immediately taking them into his own possession, may reasonably be considered as completing the tort on the water and within the jurisdiction of the court, and if the jurisdiction attaches, there can be no doubt that damage ought to be awarded.

Decree, $52 and costs.

NOTE. Since the decision of this case, by the act of March 3, 1825 [4 Stat. 115], congress have legislated further on this subject. By the 10th section of this act the master is made liable to a fine of $500, or to six months' imprisonment, who, in any foreign port or place, without justifiable cause, forces any officer or mariner on shore, or leaves them behind, or refuses to bring any home who are willing and in a condition to return.